IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ADAM ROSENSTEIN, an individual,                 No. 3:23-cv-00136-HZ

                    Plaintiff,                          OPINION & ORDER

        v.

PACIFICORP, a domestic business
corporation,

                    Defendant.

Karen E. Ford
SW Ocean Ave & Misson, Suite 208
P.O. Box 287
Carmel-by-the-Sea, CA 93921

        Attorney for Plaintiff

Naomi Levelle Haslitt
Erin M. Burris
Eden Vasquez
MILLER NASH LLP
1140 SW Washington Street, Suite 700
Portland, OR 97205

        Attorneys for Defendant

HERNÁNDEZ, Senior District Judge:

Plaintiff Adam Rosenstein brings this breach of contract and whistleblower retaliation case against his former employer, Defendant PacifiCorp. Both parties now move for summary judgment on all of Plaintiff's claims. For the reasons that follow, the Court denies Plaintiff's Motion for Summary Judgment and grants in part and denies in part Defendant's Motion for Summary Judgment.

## BACKGROUND

Defendant is an energy service provider comprised of Pacific Power and Rocky Mountain Power. Scott Decl. ¶ 3, ECF 39. Plaintiff worked as a senior engineer in Defendant's Asset Management group from November 1, 2018, to July 15, 2021. Vasquez Decl. ¶ 2, Ex. 1 ("Pl. Dep.") 89:3, ECF 36.  Plaintiff was responsible for overseeing equipment in certain substations, transformers, and distribution lines. Pl. Dep. 89:4-10. When he started his job in November 2018, Plaintiff received various onboarding and technical documents and signed a Certificate of Compliance affirming he had read Defendant's code of conduct. Pl. Dep. 89:15-90:7, Dep. Ex. 201; King Decl. ¶¶ 3, 6-7, Ex. 2, ECF 40. Plaintiff either received at the start of his employment or accessed on Defendant's intranet the Berkshire Hathaway Energy Code of Business Conduct ("Code of Conduct") and the Berkshire Hathaway Inc. Code of Conduct and Ethics ("Code of Ethics"). Rosenstein Decl. ¶ 8, ECF 35; Second Rosenstein Decl. ¶ 8, ECF 51; Suppl. Rosenstein Decl. ¶ 3, ECF 63.

As an energy service provider in Oregon, Defendant must comply with federal and state laws and regulations, including those imposed by the Oregon Public Utility Commission ("PUC"). Scott Decl. ¶ 4; Pl. Dep. 104:12-105:11. In 2019, the Oregon PUC sought to develop a "regulatory planning process for electrical utility distribution system operations and

investments." Vasquez Decl. ¶ 4, Ex. 3 ("Caswell Dep.") 61:1-62:14, Dep. Ex. 125. In December

2020, the PUC issued distribution system planning guidelines ("DSP Guidelines"), which set

forth requirements for utilities to submit a plan concerning their distribution systems. Caswell

Dep. 96:9-97:7, Dep. Ex. 132. Pursuant to the DSP Guidelines, utilities had to (1) consider

equity-related goals in developing their plans, (2) hold "workshops with stakeholders to ensure a

range of community perspectives [were] heard and considered," and (3) develop and submit a

Community Engagement Plan, which required engagement of various stakeholders to understand

their "needs, challenges, and opportunities." *Id.* According to Heide Caswell, Defendant's DSP

Project Leader, one goal of the DSP Guidelines was to "broaden the conversation beyond the

traditional voices that are part of planning[.]" Caswell Dep. 65:12-20.

In May 2021, Plaintiff joined a team of PacifiCorp employees to help prepare Pacific

Power's DSP Plan. Caswell Dep. 80:6-81:25; Pl. Dep. 101:12-15, 103:21-25. Portland General

Electric ("PGE") hosted public DSP Workshops and invited Defendant's DSP Team to attend

and observe PGE's process. Caswell Dep. 62:15-64:2, 89:3-15, 94:16-95:4, 99:20-100:5;

Schaffer Decl. ¶ 3, ECF 41. On June 9, 2021, Plaintiff and other PacifiCorp employees attended

one of PGE's virtual workshops. Pl. Dep. 154:13-18, Dep. Ex. 208; Vasquez Decl. Ex. 3, Dep.

Ex. 126. At that workshop, Northwest Energy Coalition ("NWEC") presented about "racial

equity, racial equity tool kit, and systemic racism." Pl. Dep. 155:1-13.

The next day, Plaintiff sent an email about NWEC's presentation at the June 9 meeting to

Human Resources employee Kade King. Plaintiff expressed concerns that the June 9 PGE

workshop was "political" and violated Defendant's Code of Conduct because it covered "racial

equity, and systemic racism." Vasquez Decl. ¶ 5, Ex. 4 ("King Dep.") 33:11-34:21, 45:6-24,

Dep. Exs. 1, 3; Pl. Dep. 146:19-24, 147:8-148:13 Dep. Ex. 207, 157:8-17. The same day,

Plaintiff emailed Caswell with concerns about the June 9 presentation. Pl. Dep. 190:8-13, Dep. Exs. 60, 88. And on June 14, 2021, when Plaintiff had not yet received a satisfactory response from Defendant, he filed a report with a PacifiCorp ethics hotline complaining that the June 9 meeting covered a topic entirely irrelevant to DSP and alleging that NWEC was trying to commit fraud against Defendant. Pl. Dep. 186:14-188:1; Second Vasquez Decl. Ex. 1, ECF 49.

Around this time, Caswell emailed the DSP Team about contracting with the Rocky Mountain Institute ("RMI") to facilitate stakeholder meetings and engagement in the DSP process. Caswell Dep. 120:18-121:23, Dep. Ex. 60. On June 16, 2021, Plaintiff replied all to the email, asking about PacifiCorp's due diligence before contracting with RMI. Pl. Dep. 206:17-22, 208:8-209:10, Dep. Ex. 212; Caswell Dep. 120:18-121:10, Dep. Ex. 60. Despite a lengthy follow-up phone conversation between Caswell and Plaintiff regarding RMI and the DSP work, Caswell Dep. 129:6-130:4, 228:18-230:15, Plaintiff sent another team-wide email the next day expressing additional concerns about RMI, including that it has offices in Colorado, Washington, D.C., and China, and is connected to the Sea Change Foundation, Plaintiff Dep. 196:15-198:17, 203:22-204:13, Dep. Ex. 212. For unrelated reasons, Defendant did not engage RMI on the DSP project, but it had previously worked with them in Washington. Caswell Dep. 122:13-18; Schaffer Decl ¶ 8, Ex. 3: Scott Dep. 55:20-24.

On June 24, Plaintiff had a conversation with his supervisor, Amy McCluskey, to discuss his concerns. He identified many of the same issues to McCluskey, including concerns that the trainings were biased and focused on political issues. Vasquez Decl. Ex. 5, Dep. Ex. 12; Ford Decl. Ex. B, Dep. Ex. 76, ECF 30.

A few weeks later—on July 14, 2021—the DSP Team attended another PGE DSP workshop over Microsoft Teams. Pl. Dep. 250:4-22; Schaffer Decl. ¶ 4. At this workshop, two

community-based partners—the Coalition of Communities of Color and Unite Oregon—

presented about racial equity. Pl. Dep. 250:4-22; 264:5-21. During the workshop, Plaintiff sent

the following messages in the DSP workshop chat, which went to all workshop attendees:

- "what does any of this have to do with dsp?"
- "your asking me?"
- "If a person wants a solar power i don't see why it matters what race or sexual orientation they are?"
- "Well again if we treat every one equally then why would this matter?"
- "this is way beyond the scope of an electrical utility"
- "dsp is the electrical grid system that transmits electrical power to homes"

Pl. Dep. 251:20-254:15; Schaffer Decl. ¶ 4, Ex. 1. The PGE DSP project leader and PacifiCorp

DSP Team members asked Plaintiff to hold off on further questions or thoughts. Schafer Decl. ¶¶

5-6, Ex. 2–3. One employee called Plaintiff and was distressed at Plaintiff's anger. Scott Dep.

91:6-93:2, 108:1-19, 127:21-128:12. Employees complained to human resources about the chats

and how Plaintiff acted. King Dep. 102:8-20. According to PGE, Plaintiff's comments damaged

its relationship with their presenting organizations that day. Coalition of Communities of Color

described the meeting as a "violent, very toxic and harmful space." Vasquez Decl. Ex. 3, Dep.

Ex. 134. Caswell apologized to PGE and promised to try to remedy the situation. *Id.*

McCluskey scheduled a meeting with Plaintiff the next day. Katie Aldassy, senior HR

manager, and Caswell also participated. Vasquez Decl. Ex. 2 ("Aldassy Dep.") 126:1-19, Dep.

Ex. 24. Aldassy, King, and McCluskey prepared an outline for the meeting. Vasequez Decl. Ex.

5 ("McCluskey Dep.") 185:1-9; Vasquez Decl. Ex. 5, Dep. Ex. 103; Aldassy Dep. 121:7-22.

They also considered "various outcomes" depending on Plaintiff's behavior during the meeting,

including suspension. McCluskey Dep. 162:12-23; Aldassy Dep. 121:7-22. After discussing

Plaintiff's recent behavior at the workshop, Aldassy suspended Plaintiff. Aldassy Decl. ¶¶ 5, 6;

McCluskey Dep. 123:15-124:13, Ex. 108. Plaintiff immediately resigned. Pl. Dep. 82:20-24,

83:13-21; 128:8-129:1; Aldassy Dep. 131:5-14; Vasquez Decl. Ex. 2, Dep. Ex. 24 at 5.

### STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v.

Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108,

1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the

existence of a material issue of fact implausible, that party must come forward with more

persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

The parties both move for summary judgment on all of Plaintiff's claims. The Court

grants Defendant summary judgment on Plaintiff's claims for retaliation under the False Claims

Act, for Breach of Contract as to the Code of Ethics, and for Breach of the Covenant of Good

Faith and Fair Dealing. It otherwise denies the motions.

## I.      Whistleblower Retaliation

Plaintiff brings a claim for whistleblower retaliation under Or. Rev. Stat. § ("O.R.S.")

659A.199. The statute provides:

> It is an unlawful employment practice for an employer to discharge, demote,
> suspend or in any manner discriminate or retaliate against an employee with
> regard to promotion, compensation or other terms, conditions or privileges of
> employment for the reason that the employee has in good faith reported
> information that the employee believes is evidence of a violation of a state or
> federal law, rule or regulation.

O.R.S. 659A.199(1). "To establish a prima facie case of retaliation under [O.R.S. 659A.199], the

plaintiff must demonstrate that (1) he was engaged in protected activity; (2) he suffered an

adverse employment decision; and (3) there was a causal link between the protected activity and

the adverse employment decision." *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998 (9th

Cir. 2017). The Court finds that neither party is entitled to summary judgment on Plaintiff's

whistleblower retaliation claim.[1]

### A.      Protected Activity

First, there is a dispute of fact as to whether Plaintiff engaged in a protected activity. "To

prove whistleblower retaliation under [O.R.S. 659A.199], [the plaintiff] must show that [the

---

[1] Defendant uses the *McDonnell Douglas* burden shifting test, but Plaintiff does not, arguing it's
a procedural tool that Plaintiff is not required to use. Plaintiff is correct: "Evidence can be in the
form of the *McDonnell Douglas* prima facie case, or other sufficient evidence—direct or
circumstantial—of discriminatory intent." *Costa v. Desert Palace, Inc.,* 299 F.3d 838, 855 (9th
Cir. 2002).

defendant] discharged, demoted, suspended, or otherwise discriminated or retaliated against [the plaintiff] 'with regard to promotion, compensation or other terms, conditions or privileges of employment' because [the plaintiff] 'in good faith reported information that [he] believes is evidence of a violation of a state or federal law, rule or regulation.'" *Tsur v. Intel Corp.*, 648 F. Supp. 3d 1292, 1318 (D. Or. 2022). "'[A]n employee has engaged in protected activity under [O.R.S. 659A.199] if the employee has reported information that [they] subjectively believe[] is a violation of a state or federal law, rule, or regulation and has a good faith basis for that belief.'" *McClusky v. City of N. Bend*, 332 Or. App. 1, 13–14, 549 P.3d 557 (2024) (quoting *Boyd v. Legacy Health*, 318 Or. App. 87, 98 507 P3d 715 (2022)) (brackets in original). O.R.S. 659A.199 is not limited to reported violations about the employer. *See Burley v. Clackamas Cnty*, 298 Or. App. 462, 468, 446 P.3d 564, *rev. den.* 365 Or. 721, 453 P.3d 543 (2019).

"The standard for belief of illegality in whistleblowing claims is low." *Karthauser v. Columbia 9-1-1 Commc'ns Dist.*, 647 F. Supp. 3d 992, 1018 (D. Or. 2022). "It is an issue of fact for the jury unless the Court concludes that *no* reasonable juror could find for [the plaintiff] on the evidence provided. *Id.*; *see also McClusky*, 332 Or. App. at 14 ("Whether an employee held a subjective good faith belief regarding a violation of law at the time of the report is a question of fact.").

Most of Plaintiff's reports do not constitute protected activity under the statute. Plaintiff appears to allege that the following reports are protected activity: Plaintiff's emails to King and Caswell after the June 9 meeting, Vasquez Decl. Ex. 4, Dep. Ex. 1; Ford Decl. Ex. D, Dep. Exs. 2, 10; Ford Decl. Ex. B, Dep. Ex. 88; Second Ford Decl. Ex. F, Dep. Ex. 60, ECF 52; his emails to Caswell regarding Rocky Mountain Institute, Ford Decl. Ex. B, Dep. Exs. 87, 89; Second Ford Decl. Ex. F, Dep. Exs. 60, 93; his emails to and conversation with McCluskey regarding his

concerns, Ford Decl. Ex. B, Dep. Exs. 12, 76; Second Ford Decl. Ex. F, Dep Ex. 92; his hotline

report, Second Vasquez Decl. Ex. 1; Pl. Dep. Ex. 211; and his complaints during the July 14

DSP Teams meeting, Schafer Decl. ¶ 4, Ex. 1. But most of these reports do not concern

violations of a state or federal law, rule, or regulation. For example, in Plaintiff's emails to King

and Caswell in early June 2021, he reported "unethical conduct" and concerns about political

activities in violation of the Code of Business Conduct related to the June 9 NWEC presentation.

Vasquez Decl. Ex. 4, Dep. Ex. 1; Ford Decl. Ex. D, Dep. Ex. 2; Ford Decl. Ex. B, Dep. Ex. 88.

Similarly, during the July workshop, Plaintiff only appeared to take issue with the relevancy of

the presentation to the DSP's work. Schaffer Decl. ¶ 4, Ex. 1. In sum, almost all of Plaintiff's

reports are merely reports of the violations of internal policies. *See Larmanger v. Kaiser Found.*

*Health Plan of the Nw.*, 895 F. Supp. 2d 1033, 1051–52 (D. Or. 2012), *aff'd*, 585 F. App'x 578

(9th Cir. 2014) (finding that reports by the plaintiff that another individual was "writing

corrective actions" that were "unrealistic and unfair" were not protected because the plaintiff did

not allege that there was an unlawful or criminal reason for the actions). This is not protected

under O.R.S. 659A.199.[2]

     A reasonable jury could, however, conclude that Plaintiff's hotline report was protected.

On the call, Plaintiff reported that he believed a political non-profit organization was attempting

to fraudulently influence PacifiCorp. Second Vasquez Decl. Ex. 1 (audio recording of hotline

call). Plaintiff specifically told the hotline that NWEC is funded by wealthy individuals,

including one who benefits from the sale of renewable energy systems. *Id.* He alleged that the

group was trying to "push through a scheme" that the individual might benefit from and

concluded "that's fraud." *Id.* He also alleged that it was a conflict of interest for NWEC to

---

[2] In the Second Amended Complaint, Plaintiff also cites various statutes that he claims were violated but does not elaborate on this any further in his summary judgment briefing. SAC ¶ 45.

present to the DSP Team given that they would benefit financially from renewable energy. *Id.* Notes from this call that were sent to Defendant also reflect these statements. Pl. Dep. Ex. 211. Taken together, the Court finds it is up to the jury to decide whether Plaintiff had a good faith belief that he was reporting a violation of state or federal law.

      B.      Adverse Action

The parties also dispute whether Plaintiff was subject to an adverse action. O.R.S. 659A.199 "prohibits discrimination and retaliation with regard to the terms, conditions or privileges of employment." *Neighorn v. Quest Health Care*, 870 F.Supp.2d 1069, 1103 (D. Or. 2012). The adverse action must materially affect the terms and conditions of his employment. Rude treatment, for example, "does not rise to the level of actionable retaliation" under the statute. *Id.* at 1103. "Only non-trivial employment actions that would deter reasonable employees from complaining about the . . . violations will constitute actionable retaliation." *Jamal v. Wilshire Mgmt Leasing Corp.*, 320 F. Supp. 2d 1060, 1078 (D. Or. 2004).

Here, again, there is a dispute of fact as to whether Plaintiff was subject to an adverse action. While Plaintiff ultimately made the decision to resign, immediately prior to his resignation Plaintiff was told he could no longer participate in external meetings and was suspended pending an investigation into his behavior, barring him from working or logging into the company systems until further notice. Vasquez Decl. Ex. 2, Dep. Ex. 24. While it is not clear from the record whether Plaintiff lost pay or status because of the suspension, it appears to go beyond rude treatment or a warning. *See Neighorn*, 879 F.Supp.2d at 1103 (finding an attempt to give the plaintiff a disciplinary warning was not an adverse action because it was never issued). Whether there was an adverse action is for the jury to decide.

///

C.     Causation

The parties also dispute whether there is a causal link between Plaintiff's complaints and the alleged adverse action. "To prove a violation [of O.R.S. 659A.199], a plaintiff must establish a causal link between [their] complaints about the violation of a law, rule, or regulation, on the one hand, and defendant's adverse employment actions, on the other." *Rohrer v. Oswego Cove, LLC*, 309 Or. App. 489, 497, 482 P.3d 811 (2021) (quotation marks omitted). "Courts in this District have interpreted the causation requirement to mean that the employee's protected activity 'must have been a factor that made a difference . . . in the decision.'" *Ivie v. Astrazeneca Pharms., LP*, No. 3:19-CV-01657-HZ, 2021 WL 1198306, at *12 (D. Or. Mar. 28, 2021). But, "'[a]t the prima facie stage of a retaliation case, the causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Wolff v. Tomahawk Mfg*., 689 F.Supp.3d 923, 949–50 (D. Or. 2023) (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1180 n.2 (9th Cir. 2007)).

The Court finds that this, too, presents a jury question. On one hand, Defendant cites evidence that Plaintiff was terminated for his behavior during and after the July 14 PGE DSP presentation. Vasquez Decl. Ex. 2, Dep. Ex. 24 (meeting notes reflect that the focus of the July 15 conversation was the July 14 meeting disruption). On the other, a reasonable jury could find that the hotline complaint influenced Defendant's decision. The outline that was drafted by Aldassy and McClusky in advance of the parties' July 15 call—at which Plaintiff was suspended and ultimately decided to resign—referenced the hotline call. Second Ford Decl. Ex. F, Dep. Ex. 22 ("Explain your understanding of the expectations Amy set for you during the discussions that came out of your complaints to HR and the hotline about the OPUC meeting content."). McCluskey and Caswell—who participated in the July 15 interview—were both aware of the

hotline complaint because they were interviewed by PacifiCorp in response to the complaint, which was made only a month prior to the alleged adverse action. Vasquez Decl. Ex. 2, Dep. Ex. 56. Ultimately, the hotline complaint was part of a larger pattern of conduct by Plaintiff that contributed to Defendant's decision to suspend Plaintiff. The Court finds that the jury must decide whether Plaintiff's hotline report was a factor that made a difference in Defendant's decision. Accordingly, neither party is entitled to summary judgment on Plaintiff's whistleblower retaliation claim.

## II.    False Claims Act

Both parties move for summary judgment on Plaintiff's claim under the False Claims Act ("FCA"). The FCA was enacted for "the purpose of forfending widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265-66 (9th Cir. 1996). The FCA creates civil liability for any person "who presents or causes to be presented a claim" for payment against the federal government, "knowing such claim to be false, fictitious, or fraudulent." *United States v. Ehrlich*, 643 F.2d 634, 637 (9th Cir. 1981); 31 U.S.C. § 3729(a)(1)(A). The FCA proscribes, among other activities, "knowingly" making "a false or fraudulent claim for payment or approval" and making or using "a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). The FCA "attaches liability, not to the underlying fraudulent activity, but to the claim for payment." *Hopper*, 91 F.3d at 1266 (internal quotation marks and citation omitted).

Under the FCA, a private individual may bring a "*qui tam*" action on behalf of the United States government against an individual or company who has violated the FCA. *Id.* at 1266 n.7. The purpose of a *qui tam* suit is to "encourage private individuals who are aware of fraud being

perpetrated against the government to disclose that information." *Id.* Typically, *qui tam* actions under the FCA are brought by an employee or insider at a private company "who discovers that his employer has overcharged under a government contract." *Id.* at 1266.

The FCA also contains a provision that protects "whistleblowers" from retaliation by their employer. *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab'y*, 275 F.3d 838, 845 (9th Cir. 2002). An employer may not "discharge, demote, suspend, threaten, or in any other manner discriminate against an employee" who brings forth evidence that their employer is defrauding the government. *Id.* (quoting 31 U.S.C. § 3730(h)) (brackets omitted). To state a claim for retaliation under the FCA, a plaintiff must allege facts that show: (1) the employee engaged in a protected activity under the FCA; (2) the employer knew that the employee engaged in protected activity; and (3) the employer discriminated against the employee because the employee engaged in protected activity. *Hopper*, 91 F.3d at 1269.

To have engaged in activity protected by the FCA anti-retaliation provision, the employee must have been "investigating matters which are calculated, or *reasonably could lead*, to a viable FCA action." *Id.* (emphasis added). The employee need not anticipate bringing a *qui tam* action or even be specifically aware of the FCA. *Id.* Nor must a plaintiff show that the employer actually took action to defraud the government. *Sicilia v. Boeing Co.*, 775 F.Supp.2d 1243, 1249 (W.D. Wash. 2011) (citing *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)). The plaintiff-employee need only show that they reasonably suspected their employer had made a false or fraudulent claim to the government. *Id.* Put differently, "[a]n employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Moore*, 275 F.3d at 846.

Here, Plaintiff's claim still has many of the same problems identified by the Court in resolving Defendant's Motion to Dismiss. *See* October 5, 2023 Op. & Order, ECF 15. First, Plaintiff fails to show that he engaged in a protected activity under the FCA. Plaintiff at the time did not report any activities by *Defendant* that he believed were fraudulent. His hotline report, as explained above, concerned alleged fraud against Defendant by the nonprofit NWEC in connection with Defendant's PUC-mandated activities. His other reports concerned possible violations of Defendant's codes of conduct for inviting different nonprofits to give presentations on systemic racism and inequality.

Plaintiff now makes several post hoc allegations and arguments to try to connect the reports he made in June and July 2021 to alleged fraud against the federal government. For example, Plaintiff argues:

> Rosenstein was concerned that undue influence by special interest entities representing financial interests in specific types of equipment and systems would adversely affect the DSP planning process and reports to the PUC. Such plans and reports would relate directly or indirectly to grants of state and federal money for distribution systems.

Pl. Opp'n 28, ECF 50. Similarly, in his Second Amended Complaint, Plaintiff generally alleges that Defendant receives federal funds. SAC ¶¶ 56–59, ECF 16. Plaintiff also alleges that Defendant made false representations in connection with applications for federal grants but offers no additional detail as to when these representations were made, how they were false, and their connection to the reports he made to Defendant in 2021. SAC ¶ 60. Even if the Court were to consider these, they are too conclusory and too remote from Plaintiff's reports to pass muster at this juncture. *See Moore*, 275 F.3d at 845 ("[S]pecific awareness of the FCA is not required, but [the plaintiff] must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action.").

Second, while Plaintiff may have in good faith believed some level of fraud was being committed, Plaintiff has failed to show that a reasonable employee in the same or similar circumstances might believe that a few presentations from nonprofit entities are evidence Defendant was possibly committing fraud against the federal government to fund renewable energy projects and weaken American energy independence. *See Sicilia*, 775 F.Supp.2d at 1253 ("[T]he degree to which plaintiff's suspicion of fraud corresponds with what the defendants were actually doing is relevant to whether plaintiff's suspicion of fraud was reasonable."). Were the Court to find otherwise, "any employee who concocted a theory about how his employer was defrauding the government could avail himself of the protections of the FCA—regardless of how far-fetched his theory might be." *Id.*

## III.    Breach of Contract

To establish breach of contract under Oregon law, a plaintiff must show (1) the existence of a contract and its relevant terms; (2) that the plaintiff fully performed and did not breach the contract; (3) that the defendant breached the contract; and (4) that the breach resulted in damages to the plaintiff. *Schmelzer v. Wells Fargo Home Mortg.*, No. CV-10-1445-HZ, 2011 WL 5873058, at *4 (D. Or. Nov. 21, 2011) (citing *Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570-71, 927 P.2d 1098 (1996)). Whether a contract exists "is a question of law." *Wieck v. Hostetter*, 274 Or. App. 457, 471, 362 P.3d 254 (2015) (citation omitted). To determine whether a contract was formed under Oregon law, courts apply an "objective theory of contracts." *Id.* To form a contract, there must be "an offer, an acceptance of that offer, and an exchange of consideration." *Id.* (citation omitted). The parties must manifest mutual assent to the agreement, which "may be expressed in words or inferred from the actions of the parties." *Bennett v. Farmers Ins. Co.*, 32 Or. 138, 148, 26 P.3d 785 (2001). "Formation of a contract

requires the meeting of minds, which is measured by objective manifestations of intent by both parties to form the contract." *Vanderselt v. Pope*, 155 Or. App. 334, 339, 963 P.2d 130 (1998).

Oregon courts recognize implied-in-fact contracts where "the parties' agreement is inferred, in whole or in part, from their conduct." *Staley v. Taylor*, 165 Or. App. 256, 262, 994 P.2d 1220 (2000). Under certain circumstances, an employee's acceptance of workplace policies may constitute a valid contract with the employer. *See Yartzoff v. Democrat-Herald Publ'g Co.*, 281 Or. 651, 656-57, 576 P.2d 356 (1978) (denying summary judgment for the defendant employer because questions of fact existed as to whether statements in an employee handbook were part of the original employment contract). However, Oregon courts have refused to recognize an implied contract where a party has made a "clear, explicit, contemporaneous declaration that it did *not* wish to form a contract on that subject." *Vanderselt*, 155 Or. App. at 339; *see Lawson v. Umatilla Cnty.*, 139 F.3d 690, 693 (9th Cir. 1998) ("Oregon courts have consistently held that a disclaimer in an employee handbook or personnel policies is sufficient to retain an employee's at-will status."). "[W]here the employee cannot reasonably infer the employer's assent to an agreement modification through its conduct, an employee manual or handbook cannot modify the employment agreement." *Rouse v. Wal-Mart Stores, Inc.*, No. 05-3115-CO, 2006 WL 8446602, at *4 (D. Or. July 6, 2006). The question here is whether the either the Certificate of Compliance or the Code of Ethics created or were part of a contract with Defendant.[3]

---

[3] Plaintiff only specifically alleges breach of the Certificate of Compliance and the Berkshire Hathaway Inc. Code of Business Conduct and Ethics. *See* SAC ¶¶ 70-73. And as the Court previously held in its Opinion & Order resolving Defendant's Motion to Dismiss, the Berkshire Hathaway Energy Code of Business Conduct (also referred to as the "Code of Conduct" or "BE Code of Conduct") has an express disclaimer that precludes contract formation. October 5, 2023 Op. & Order 11-12. Further, while Plaintiff alludes to other documents or materials that might form the basis of his contract claim in the Second Amended Complaint and the summary

Turning first to the Certificate of Compliance, Plaintiff alleges that Defendant made a promise not to retaliate against him in the Certificate: "I understand that I may, in good faith, report possible violations of the code without adverse consequences to me even if the violations are ultimately proven not to have occurred." Rosenstein Decl. Ex. C. He contends that Defendant breached this promise when they suspended Plaintiff after he made reports of ethics violations and political conduct prohibited by the Code of Conduct. SAC ¶¶ 74–76. The Court finds, however, that issues of fact preclude a finding regarding contract formation at this stage of the proceedings. On one hand, Defendant argues that the Certificate of Compliance was part and parcel with the Code of Conduct, which contained an express disclaimer that it *did not* constitute a contract. King Decl. Ex. 1 at 4 ("The contents of this policy DO NOT CONSTITUTE THE TERMS OF A CONTRACT OF EMPLOYMENT[.]"). Defendant contends that this Code of Conduct is given to all PacifiCorp employees when they are hired along with the Certificate of Compliance. King Decl. ¶¶ 3, 7–8. It further argues that the Certificate of Compliance incorporates the Code and its disclaimer because it references the Code. King Decl. Ex. 2 ("I acknowledge that I have received and agree to read a copy of Berkshire Hathaway Energy's Code of Business Conduct. I understand the purpose and contents of this code and acknowledge my responsibility to comply with this code[.]").

But it is unclear whether Plaintiff was provided with a copy of the Code of Conduct at the time that he was hired and signed the Certificate of Compliance. Plaintiff is a little evasive in his testimony on this point, testifying that he received several versions of the Code throughout his employment and at the time his employment began. Pl. Dep. 94:1-97:23. And in his declaration, Plaintiff states that the Certificate of Compliance was not part of or attached to the Code or any

judgment briefing, the Court will not consider as the basis for a breach of contract claim any document not *specifically* identified as such in the Second Amended Complaint. *See id.* at 13 n.4.

other documents. Second Rosenstein Decl. ¶ 10. Viewed in the light most favorable to Plaintiff, the Court finds that there is an issue of fact precluding summary judgment on whether the Certificate of Compliance constituted a contract.

There are similar problems with the Code of Ethics. The crux of this issue is whether Plaintiff accessed this document on the intranet or whether it was given to him by Defendant at the start of his employment. In support of his opposition to the motion to dismiss and in support of his motion for summary judgment, Plaintiff stated that he accessed this document on the intranet. Rosenstein MTD Aff. ¶ 3 ("Exhibit A is a true and correct copy of the Berkshire Hathaway Code of Business Conduct which is posted on the PacifiCorp intranet system used by employees."), ECF 13; Rosenstein Decl. ¶ 8 (same). His testimony elsewhere in the summary judgment record is murky, saying he either "received" a copy of the Code of Ethics when he was hired or accessed it on the intranet. Second Rosenstein Decl. ¶ 8 ("I received a copy of [the Code of Ethics] and other company documents provided when I was hired by either being handed a copy or by accessing it on the company intranet website."); Suppl. Rosenstein Decl. ¶ 3 (stating he was "directed by representatives of PacifiCorp when [he] was hired and while [he] was an employee to access the [intranet] as a source of information and documents for company employees."); *see also* Pl. Dep. 94:1-97:23 (testifying that he received "a lot of" employment documents at hiring including "several different versions of the Code of Business Conduct"). Even viewing this conflicting evidence in the light most favorable to Plaintiff, the Court finds that there is insufficient evidence to show that there was a "meeting of the minds" with regard to the Code of Ethics. *See* October 5, 2023 Op. & Order 12 ("The existence of this document on the intranet, alone, is not sufficient to demonstrate mutual assent to the Conduct and Ethics Code or an intention by Defendant to be bound to it."); *see also Vanderselt*, 155 Or. App. at 399

("Formation of a contract requires the meeting of minds, which is measured by objective manifestations of intent by both parties to form the contract."). Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim that it breached the Code of Ethics but not on his claim regarding the Certificate of Compliance.

## IV.    Breach of the Covenant of Good Faith and Fair Dealing

Finally, the parties move for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Oregon courts recognize an implied contractual duty of good faith and fair dealing. *See Best v. U.S. Nat'l Bank. of Or.*, 303 Or. 557, 561, 739 P.2d 554 (1987). The contractual good faith doctrine is designed to "effectuate the reasonable contractual expectations of the parties." *Id.* at 563; *see also Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445, 240 P.3d 94 (2010) (the implied duty of good faith and fair dealing "serves to effectuate the objectively reasonable expectations of the parties"). "[S]o long as it is not inconsistent with the express terms of the contract, the duty of good faith is a contractual term that is implied by law into *every* contract." *Eggiman v. Mid-Century Ins. Co.*, 134 Or. App. 381, 386, 895 P.2d 333 (1995) (internal quotation marks omitted). The duty "does not operate in a vacuum[;]" rather it "focuses on the agreed common purpose and the justified expectations of the parties, both of which are intimately related to the parties' manifestation of their purposes and expectations in the express provisions of the contract." *Or. Univ. Sys. v. Or. Pub. Emp. Union*, 185 Or. App. 506, 515–16, 60 P.3d 567 (2002) (internal quotation marks omitted). Because the duty cannot contradict an express contractual term, it "'may be implied as to a disputed issue *only* if the parties have not agreed to an express term that governs that issue.'" *Arnett v. Bank of Am., N.A.*, 874 F.Supp.2d 1021, 1033 (D. Or. 2012) (quoting *Or. Univ. Sys.*, 185 Or. App. at 511) (emphasis in *Arnett*).

Assuming there is a contract between the parties, Plaintiff's claim for breach of the covenant of good faith and fair dealing fails. Plaintiff's allegations in the Second Amended Complaint are, as the Court previously held, essentially duplicative of the promises in the alleged contract:

> Defendant, by its actions described herein, breached the covenant of good faith and fair dealing. The promises by Defendant encouraged Plaintiff to raise issues and make reports concerning unethical conduct. Defendant then deliberately interfered with the ability of Plaintiff to make such reports, including, without limitation, ordering him not to make such reports and threatening him when he did. This undermined and deprived him of the ability to perform under the Codes of Conduct.

SAC ¶ 81; *see also* October 5, 2023 Op. & Order. Plaintiff goes on to identify instances where Plaintiff made a report and Defendant took some action against him. *See* SAC ¶ 83 (alleges he was told to "shut up and get on board" or was ignored when he made complaints). Plaintiff, in other words, only identifies an implied term that is duplicative of the terms of the contract at issue here: the ability to report unethical conduct without retaliation.[4] *See* Pl. Reply 31, ECF 56 (Defendant "also failed to properly investigate or take[] action based o[n] his reports . . . . All of these actions . . . undermined [Plaintiff's] ability to fulfil[l] his obligations to report ethical violations. He was blocked and threatened as described herein to intimidate him into halting his reports and investigation."). Accordingly, this claim fails.

---

[4] The Court declines to find that there was an implied duty to investigate Plaintiff's complaints as part of the duty of good faith and fair dealing. *See* FAC ¶ 82 ("Implied in the obligation to report violations of the BH Code is a commitment to accept and investigate reported violations."). The duty of good faith and fair dealing implies that neither party will engage in any act that will "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Perkins v. Standard Oil Co.,* 235 Or. 7, 16, 383 P.2d 107 (1963). Here, the only alleged promise made to Plaintiff was a promise that Plaintiff would not suffer adverse consequences for reporting violations of Defendant's Code of Conduct regardless of whether those violations were true. Rosenstein Decl. Ex. C. Plaintiff has not provided the Court with any authority for reading a duty to investigate into the duty of good faith either under Oregon law or in the context of this case.

**CONCLUSION**

The Court GRANTS in part and DENIES in part Defendant's Motion for Summary

Judgment and DENIES Plaintiff's Motion for Summary Judgment. The Court dismisses

Plaintiff's claims for retaliation under the False Claims Act, Breach of Contract as to the Code of

Ethics, and for Breach of the Covenant of Good Faith and Fair Dealing.

IT IS SO ORDERED.


DATED:_____January 3, 2025____.



_____
MARCO A. HERNÁNDEZ
United States Senior District Judge